## U.S. DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DONNA KELLY, | : | CIVIL ACTION NO. |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| HARTFORD HEALTHCARE CORP. | : | |
| and HARTFORD HOSPITAL, | : | |
| | : | |
| Defendants | : | December 11, 2018 |

## **COMPLAINT**

## **JURISDICTION AND VENUE**

1.      This is an action for damages, declaratory and injunctive relief, and attorney's fees brought pursuant to the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §621 et seq., and the Connecticut Fair Employment Practices Act (CFEPA), C.G.S. § 46a-60(a) et seq.  This action seeks declaratory, monetary, compensatory, liquidated and punitive damages, equitable relief, and attorney's fees.

2.      Jurisdiction of this action is invoked pursuant to 28 U.S.C. §§1331, 1343, and 42 U.S.C. §2000e-5(f)(3).

3.      Venue in this district is appropriate pursuant to 28 U.S.C. §1391 and 42 U.S.C. §2000e(f)(3), because this is the district in which the discriminatory conduct occurred.

**PARTIES**

4.      Plaintiff Donna Kelly is a legal resident of the United States, actually residing in Holyoke, Massachusetts.

5.      At all times relevant to this Complaint the Plaintiff was an employee of the defendants, as that term is defined within ADEA, 29 U.S.C. § 630(f) and the Connecticut Fair Employment Practices Act (CFEPA), C.G.S. § 46a-51(9).

6.      The Plaintiff's date of birth is XX-XX, 1954.   She is currently 64 years of age.

7.      The Defendants are Hartford Hospital and Hartford Healthcare Corp. Defendant Hartford Hospital is a Connecticut Corporation with an office and principal place of business at 85 Jefferson Street, Hartford CT 06106.  The Connecticut Secretary of State's office identifies Defendant Hartford Hospital's agent for service as Hartford Healthcare Corp. with a business address at 85 Jefferson Street, Hartford CT 06106.   Defendant Hartford Healthcare Corp., is a Connecticut Corporation with an office and principal place of business at One State Street Suite 19, Hartford CT 06106 and at 85 Jefferson Street, Hartford CT 06106.  The Connecticut Secretary of State's office identifies Defendant Healthcare Corp.'s agent for service as Hartford Hospital with a business address at 85 Jefferson Street, Hartford CT 06106.

8.      Defendant Hartford Hospital is an "employer" within the meaning of the ADEA and CFEPA.

2

9.      Defendant Hartford Healthcare Corp. is an "employer" within the meaning of the  ADEA and CFEPA.

10.      At all times relevant to this Complaint, Defendant Hartford Hospital was a wholly owned subsidiary of Defendant Hartford Healthcare Corp.

11.      At all times relevant to this Complaint, the Defendants were joint employers of the Plaintiff.  In the alternative, the Defendants functioned as a single integrated employer.

12.      Each of the Defendants employ over twenty employees.  At all times relevant to this complaint, each of the Defendants have been the Plaintiff's employer within the meaning of the ADEA and CFEPA.

13.      On or about March 15, 2018, the Plaintiff filed administrative charges of discrimination on the basis of age with the Connecticut Commission of Human Rights and Opportunities and with the Equal Employment Opportunities Commission.

14.      On or about October 5, 2018, the Plaintiff received a release of jurisdiction from the Connecticut Commission of Human Rights and Opportunities.  On or about October 25, 2018,  the Plaintiff received a Notice of Right to Sue from the Equal Employment Opportunity Commission.

15.      The Plaintiff has fulfilled all administrative prerequisites necessary to maintain this action.

3

## FACTS

16.     The Plaintiff began working for the Defendants in May 1997.  She was initially hired by the Defendants as a Registered Nurse I, actually working in the hemodialysis department.  She was then made a Registered Nurse  II.  She held this position through 2006.  She was successful in these positions. The Plaintiff performed her duties in a dedicated and effective manner and received positive reviews and evaluations from the Defendants.

17.     In or around 2006 the Plaintiff was promoted to Clinical Leader. She was successful in this position. The Plaintiff performed her duties in a dedicated and effective manner and received positive reviews and evaluations from the Defendants.

18.     In October 2007 the Plaintiff was also made Interim Manager.  She did not initially want this position, because she had no managerial experience.  However, she agreed to do the job while the Defendants looked for a Nurse Manager.

19.     Nobody applied for the Nurse Manager position.  The Plaintiff continued to perform the duties and responsibilities of both the Clinical Leader and Interim Manager Positions.   She was successful in these positions. The Plaintiff performed her duties in a dedicated and effective manner and received positive reviews and evaluations from the Defendants.

20.     In 2009 the Plaintiff was promoted to Nurse Manager.    From 2009 through 2012, the Plaintiff was successful in this position. The Plaintiff performed her duties in a dedicated and effective manner and received positive reviews and evaluations from the Defendants.

4

21.     In or around 2013, the Defendants wanted to increase the productivity and efficiency of the inpatient hemodialysis area (called the Acute Room).  The Plaintiff was instructed to spend more time supervising staff in that area and increasing their productivity.  This meant that in addition to performing the duties that she had been performing satisfactorily for many years, she needed to more closely supervise the Acute Room staff and ensure that the staff made changes that would result in greater productivity.

22.     The Acute Room staff were resistant to these changes which were unpopular with the staff.

23.     From 2013-2015, the Plaintiff struggled to increase the productivity and efficiency of the area.  While productivity and efficiency were increased as the Defendants had requested, some of the staff were unhappy.  There were concerns raised by staff about the Plaintiff's demeanor and style of management, resulting in a written warning in 2013.

24.     While the Plaintiff did not agree with all of the criticism raised, she understood the concerns.  The Plaintiff tried to address these concerns, but was not entirely successful.

25.     In the end of 2014 the Director, Cathy Yavinsky, told the Plaintiff that the Defendants still had concerns about the Plaintiff's management style and would be removing her from the Nurse Manager position.

26.     Yavinsky told the Plaintiff that the Defendants recognized that she a good worker with excellent knowledge and strong attention to detail.  Yavinsky indicated that

5

while they wanted to remove the Plaintiff's managerial responsibilities, the Defendants did not want to terminate her. Instead, the Defendants wanted to transition her to a different role.

27.     The Defendants first offered the Plaintiff a staff nurse role.  The Plaintiff explained that she would be uncomfortable with that role since she had not worked as a staff nurse for many years.

28.     The Defendants then offered the Plaintiff the newly created position of Quality Improvement Coordinator/Quality Manager. Yavinsky told the Plaintiff that this position would be the equivalent of the Nurse Manager position, and that her pay would not be changed.

29.     As Nurse Manager, the Plaintiff had been performing quality responsibilities successfully for several years.  The Plaintiff understood that there had been issues with staff and was pleased that she was being offered this equivalent role, which was much more in line with her skill set.  She promptly accepted the new position.

30.     The Plaintiff began in this new role effective January 26, 2015.

31.     In 2015 and 2016, the Plaintiff was successful in this new position. The Plaintiff performed her duties in a dedicated and effective manner.  In October 2015 and again in October 2016, the Defendants evaluated the Plaintiff.  While the evaluations contained constructive criticism, the Defendants evaluated the Plaintiff as meeting or exceeding their expectations in this new role.  Things were going well.

32.     However, in September 2016,  Alex Ilchenko was hired as Clinical Nurse Manager.  Ilchenko is in his mid 30's.

33.      Although the Plaintiff had been told that her position would be the equivalent of the Nurse Manager position, she was told that she would be reporting to Ilchenko.

34.     From the start of his employment with the Defendants, Ilchenko treated younger male employees more positively than older employees.  For example, he seemed to mentor the younger workers and ignore or criticize the older ones.

35.     Under the Defendants pension plan, the Plaintiff would receive a significant increase in her pension at the end of each year through 2020, shortly after her 66th birthday.   The Defendants and Ilchenko were aware that the Plaintiff intended to remain working at least until that time.  The Plaintiff had mentioned this intent on several occasions.

36.     When things were stressful or something would go wrong, the Plaintiff and other employees would joke about the number of weeks until the 66th birthday.   In fact, the Plaintiff had jokingly created a white board with the number of weeks until that date listed which was hung on the Plaintiff's office door.  Alex Ilchenko had seen this board and understood its meaning.

37.      Ilchenko was therefore well aware of both the Plaintiff's relative age and of her intention of working at least until the end of 2020.

38.      Ilchenko harassed and discriminated against the Plaintiff on a daily basis.  For example, he would change deadlines and job expectations without notice and

would constantly watch the Plaintiff on the floor.  He did not treat similarly situated younger employees in this same manner.

39.     Although the Plaintiff became concerned that she was being targeted because of her age, she continued to do her job.

40.     Ilchenko also began to remove the Plaintiff's responsibilities.

41.     On April 28, 2017, Ilchenko came to the Plaintiff's office and said he wanted to speak to her.  He closed the door and told the Plaintiff that she was no longer going to be a "Super-User" for the EHR.  At that time the Plaintiff had been involved with EPIC since the beginning, helping to build some of the dialysis documents.  She had not only gone to classes to learn how to be a Super-User, she had also trained the other staff on the process before go-live in August 2016.  In fact, the Plaintiff was the most experienced of the "Super-Users."   She was also the oldest.

42.     Ilchenko told the Plaintiff that he was going to make Matt Brunelle, a substantially younger staff nurse, a Super-User, in the Plaintiff's place.

43.     Ilchenko claimed that he wanted the Plaintiff removed as a Super-User because she had been late entering data into CROWNWeb - the CMS database.  This was false.  The Plaintiff had never been late entering data.

44.     Ilchenko also told the Plaintiff that he did not want her to go to group huddles on the unit.   He suggested that she was no longer to even talk to staff.  Ilchenko tried to isolate the Plaintiff, telling her to stay in her office and focus on quality, and quality only.

8

45.     On information, these changes were made because of the Plaintiff's age.

46.     The Plaintiff was upset at the reduction in her duties and responsibilities and the attempt to isolate her.  However, she did as instructed.  She stayed in her office, did not attend huddles, did not talk to staff and, when asked to help with EPIC, she referred them to the official Super-Users.

47.     On May 9, 2017, at Ilchenko's request, the Plaintiff attended a meeting with Matt Munafo from Human Resources and Ilchenko.  During this meeting Ilchenko made a number of untrue claims about the Plaintiff's performance.  Ilchenko claimed that the Plaintiff had been late entering data in CROWNWeb, that she had told staff that they did not have to wear PPEi, and that she had missing data for QAPI meetings. Each of these claims were false.

48.     Ilchenko also made claims about the Plaintiff which were exaggerated or misleading.   For example, Ilchenko claimed that the Plaintiff had failed to give him audit information in the fall of 2016 until he asked for them.  While true, Ilchenko was aware (because he and the Plaintiff had previously discussed the issue) that this was the result of a simple misunderstanding, in that the Plaintiff had thought that the audit information was to be turned in when completed.  Ilchenko also blamed the Plaintiff for a nurse's failure to check test results for a patient who was thought to have Hepatitis B, when the Plaintiff had actually been the one to catch the error.

49.     Ilchenko also explicitly referenced his knowledge of the Plaintiff's age in this meeting and instructed her to remove the numbers of the months before she would be eligible for the enhanced pension off her white board.  The Plaintiff explained that it

9

was a only a joke but did as she had been instructed.

50.    During the meeting, Matt Munafo stated that the Plaintiff seemed defensive and asked if she was having difficulties because she had previously been the Nurse Manager.  The Plaintiff reassured Munafo and Ilchenko that this was not the case.  She explained that she loved her new role, and agreed that it was better suited to her skills.  The Plaintiff also explained that if she seemed defensive it was because of Ilchenko's actions.   She explained that Ilchenko had removed her as a Super-User, and had told her that she could no longer attend huddles and that she was not to speak to staff.

51.    Shortly after this meeting, the Plaintiff called Matt Munafo to express her concerns.  She explained that she and Ilchenko had previously discussed most of his criticism and that she had been responsive.  She indicated that she was surprised to have had Ilchenko bring up the issues again with Human Resources when she had not made the same "error" again.   Matt responded with, "Ohhh".

52.    On or about May 11, 2017, the Plaintiff received a Memorandum from Munafo which indicated, among other things that the Plaintiff could continue to attend huddles and speak with staff and could remain an Epic Super-User, although this was not the primary responsibility of her job.

53.    Based on the Memo, the Plaintiff and Ilchenko were supposed to have weekly meetings.

54.    On June 26-28, 2017, the Defendants had a CMS visit.  There were 22 deficiencies and 2 Conditions of Coverage/Participation.

10

55.     Ilchenko asked the Plaintiff to come up with action plans for all the deficiencies.  In the past these action plans had been created by the Director.  The Plaintiff explained that she was hesitant because she had never created such a plan. Ilchenko directed the Plaintiff to work with Dan Levesque and create the plan.  They did so.

56.     On August 4, 2017, at Ilchenko's request, the Plaintiff attended another meeting with Matt Munafo from Human Resources and Ilchenko.  During this meeting Ilchenko again raised a number of alleged false or exaggerated concerns about her performance.

57.     Before she left the office, the Plaintiff asked Matt for a private meeting. He said he couldn't, he had another meeting, but that they could meet before the end of the day. Instead, Ilchanko and Munafo scheduled the Plaintiff for a second meeting. When the Plaintiff arrived at this second meeting she was given a written warning.

58.     The written warning again included false or exaggerated criticism.  The Complainant responded in writing as permitted by the Connecticut Personnel Files Act.

59.     On information and belief, the issues raised in the Plaintiff's written response were never investigated by the Defendants.

60.     The Plaintiff also filed an internal complaint with the Defendant's Employees' Council, explaining that she did not feel that she was being treated fairly by Ilchenko, that she was being harassed and that the written warning was not merited. During the complaint process, the Plaintiff identified several witnesses who would have relevant information.  On information and belief, no one ever spoke to these witnesses.

61.     On October 16, 2017, Ilchenko gave the Plaintiff a copy of the decision from the Employees' Council, indicating that the Written Warning would stand.  He then stated that he would be doing the Plaintiff's annual performance evaluation at 2:30 that afternoon.

62.     The evaluation was negative, and was filled with false or exaggerated criticism.   Ilchenko told the Plaintiff that he expected there to be no deficiencies in 2018.  It is virtually impossible to have no deficiencies.  On information and belief Ilchenko was aware of this and was setting a task for the Plaintiff that he knew she could not meet.

63.     On October 31, 2017, the Plaintiff met with Suzanne Yeakel, the Nursing Director, to discuss a list of concerns regarding illegal and unethical things that Ilchenko had done. At that time the Plaintiff tried to discuss the discrimination and harassment from Ilchenko.  Yeakel commented that there were some things that were very concerning and she would need to speak to some people.  However, Yeakel indicated that she did not want to discuss Ilchenko's treatment of the Plaintiff, stating that it was in the past.

64.     Yeakel asked if there was anyone else she could speak to about the concerns.  The Plaintiff identified Val Borgeson and Debbie Cofrancesco.  Yeakel never spoke to the witnesses.  On information and belief, Yeakel never investigated the concerns.

65.     On November 28, 2017, Acacia Ransom had returned to check on infection control practices.  Ransom was the liaison between CT DPH and IPRO ESRD

Network of New England.  She was working with all Connecticut dialysis units to improve infection control.  In her April visit, Ms. Ransom had pointed out a number of things that needed to be corrected.  On her return visit in November, Ransom indicated that the Hospital was much improved in all facets of infection control.  On information and belief, the staff said that the improvement was due in large part to the Plaintiff's efforts.

66.    The Plaintiff had been on vacation when Ransom visited.  When she returned on December 4, 2017, she learned of this excellent result.  However, Ilchenko did not mention the positive results.  Instead, the Plaintiff was called into a meeting with him and Munafo to discuss allegations that there had been "multiple complaints" about her from staff.

67.    Apparently Ilchenko had received an email from Kathy Kaflik and Sukanya (Sam) Phangdee alleging that the Plaintiff had yelled at Sam in the week before her vacation.  The Plaintiff explained that Sam had failed to use gloves when touching the dialysis machine - a grave violation of safety practices.   She had spoken to her about this failure.  However, on the following day she observed her doing the exact same things.  Such a failure could result in harm to patients, and so she had spoken to Sam again, reprimanding her for repeating this serious issue.  The Plaintiff explained that she had not yelled.  When asked if there was anyone else within hearing distance, the Plaintiff identified Robert Melo.  Munafo stated that he would investigate and would respond by Thursday, December 7, 2017.

68.     Ilchenko spoke again to the Plaintiff about the issue on December 5, 2017.   Ilchanko accused the Plaintiff of creating a "hostile work environment".   Ilchenko told the Plaintiff to bring any concerns to human resources.

69.     On December 5 or 6, 2017, the Plaintiff met with Munafo and reported the "hostile work environment" comment.

70.     On December 7, 2017, the Plaintiff was again told to meet with Ilchenko and Matt Munafo.   At that time she was given a final written warning for allegedly yelling at staff and talking in a loud voice.   During this meeting the Plaintiff complained that she was being treated more negatively because of her age and gender.   She said, "Let's talk about Jimmy" (James Forristall).   He had been given a final written warning for calling out and then was a no call/no show one day and a call out two days later.   Based on the usual practice he would have been suspended or terminated.   However, Ilchenko intervened on his behalf and he was not suspended or terminated at that time."   The Plaintiff asked if Forristall was treated more favorably and given another chance because he was young, male, paid less and if she wasn't being given a second chance because she was old, female and paid more.   The Plaintiff also requested that the Defendants do an investigation into Ilchenko to find out what was really going on.   The Plaintiff told Munafo that Ilchenko had been harassing her for months.   She explained,  "I can guarantee that he will find something to fire me".

71.     The Plaintiff also filed a written response to her final written warning in accordance with Connecticut law.   In this written response, the Plaintiff again explained that she was being treated differently than similarly situated employees who were not in

the same protected classes, and explicitly stated that she believed that this was due to her age and gender.

72.     On December 11, 2017, the Plaintiff e-mailed Munafo a request to do an investigation on her unit.  She identified 11 staff he could speak to and asked that she also be included.  He did not speak to her.  On information and belief, he did not speak to the witnesses she identified.

73.     On December 11, 2017, the Plaintiff had a bi-weekly meeting with Ilchenko.  He asked if she had completed an orientation for Nat Souksavath (PAA) to NHSN.  The Plaintiff had trained the employee on one of the systems but not NHSN. The Plaintiff told Ilchenko that she had not trained Nat on entering data into the NHSN system because she did not yet have the data to enter.  With NHSN, the deadline for entering in July, August and September data was December 31, 2017.  The Plaintiff had to gather all data for CROWNWeb and had been given daily audits, weekly audits and other work.  Her plan was to gather all of the NHSN data after the QAPI meeting on December 20, 2017, and then teach Nat how to enter it at that time.  This would allow the Plaintiff to complete the work for the QAPI meeting, and would have the actual data to train Nat.  It would also give the Plaintiff sufficient time to answer Nat's questions and train her before the December 31, 2017 deadline.  Ilchenko asked when the next data was due and the Plaintiff explained that it was due on December 31, 2017, and that she would have the orientation completed by that date.

74.     On information and belief, Ilchenko was upset that the Plaintiff spoke to other employees about the discrimination and harassment that she had been subjected

15

to.

75.     On December 13, 2017, the Plaintiff met with Matt Munafo, Suzanne Yeakel and Cheryl Ficara, the Vice President of Patient Care Services.  Ficara stated that she expected professionalism and that issues were not to be discussed in front of patients.  She asked if she could trust the Plaintiff to do that.  The Plaintiff assured her that she would not discuss such issues in front of patients.  Ficara stated that she was aware that the Plaintiff had made a complaint about Ilchenko and that she would be fair with the results.  The Plaintiff again complained that she had been harassed and targeted by Ilchenko for months.

76.     On December 14, 2017, the Plaintiff attended the afternoon huddle. Marlene Harris, a hospital nurse educator, was showing a video.  In the hospital, when a nurse calls a Rapid Response, an MD, an ICU nurse and a Respiratory Therapist show up.  At the end of the video, Judy Krupa, nurse educator, told Marlene she would put together a list of situations that Marlene could go over with new staff when they discussed Rapid Responses.  The Plaintiff was concerned that staff might be confused about what occurred when Rapid Response was called and that patients could be harmed as a result.  She spoke up to clarify this, explaining that what the video showed would not be what would actually occur on their unit.  Because they were an out-patient department, an ICU Nurse and therapist do not come in response to the Rapid Response.  Instead, an Emergency Department nurse comes and they "scoop and run," bringing the patient to the Emergency Department.  The Plaintiff spoke only to ensure that new staff were not confused by the video, and that patients did not suffer.

16

77.    On December 20, 2017, the Plaintiff was called into a meeting with Ilchenko, Matt Munafo and Suzanne Yeakel, and terminated allegedly for failing to finish the orientation of Souksavath and for speaking up in a huddle in front of new staff.

78.    The Plaintiff was not allowed to go back to her office to get her things or say goodbye to her co-workers.  She was escorted to her car by security.  She was never allowed back. Because she was terminated two weeks before the end of the year, the Plaintiff was denied a sizeable pension increase, approximately 13% of her salary for the year.

79. On information and belief, the Defendants never investigated the Plaintiff's complaints of age discrimination before terminating her.

80.    The Defendants, and in particular Ilchenko had a pattern and practice of disciplining and terminating other older employees for exaggerated or pretextual reasons.

81.    Older employees John Kobetitsch and Marion Honsiger were given warnings for pretectual reasons.

82.     Older per diem employees Barbara Perodeau, David Pace and Carol Jaroszewski were all terminated.  In one case,  Ilchenko stated, "she is over 70, right".

83.     Ilchenko made negative comments about older per diem employee Virginia Lebarre, asking when she would retire and referring to her as "too slow".  He did not have an opportunity to terminate her because she resigned over the poor treatment.

17

84.     However, younger employees who engaged in serious misconduct were not disciplined or fired.  For example, other employees shouted and yelled and were not disciplined.

85.     On several occasions during the huddle, employees used profanity and on one occasion one employee gave another employee "the finger" and they were not disciplined.

## COUNT ONE (ADEA)

86.     The Plaintiff hereby repeats, realleges and incorporates paragraphs 1-85 above.

87.     The Defendants have engaged in a pattern and practice of discriminating against older employees, and of offering preferential treatment to younger employees and applicants.

88.     The Plaintiff's age was a motivating factor in the Defendants decision to terminate her employment.  The Defendants stated reason for terminating the Plaintiff's employment is pretextual.  The Defendants decision was motivated by unlawful animus toward the Plaintiff because of her age.

89.     By this conduct, the Defendants have discriminated against the Plaintiff in violation of the rights secured to her by the ADEA, 29 U.S.C. §621, et seq.

90.     The Defendants engaged in the above discriminatory conduct with malice or with reckless indifference to the Plaintiff's federally protected rights.

91.     As a result of the Defendants illegal conduct, the Plaintiff has suffered damages in the form of lost wages, benefits and other attendant rights, privileges and

18

conditions of employment.

## COUNT TWO (CFEPA)

92.     The Plaintiff hereby repeats, realleges and incorporates paragraphs 1-91 above.

93.     The Defendants have engaged in a pattern and practice of discrimination against older employees, and of offering preferential treatment to younger employees and applicants.

94.     The Plaintiff's age was a motivating factor in the Defendants decision to terminate her employment.

95.     The Defendants stated reason for terminating the Plaintiff's employment is pretextual.  The Defendants decision was motivated by unlawful animus toward the Plaintiff because of her age.

96.     By this conduct, the Defendants have discriminated against the Plaintiff in violation of the rights secured to her by CFEPA, C.G.S. §46a-60a et seq.

97.     The Defendants engaged in the above discriminatory conduct with malice or with reckless indifference to the Plaintiff's rights.

98.     As a result of the Defendants illegal conduct, the Plaintiff has suffered damages in the form of lost wages, benefits and other attendant rights, privileges and conditions of employment and has endured mental and emotional distress, pain and suffering, humiliation, mental anguish and other personal injuries.

## COUNT THREE (ADEA/Title VII Retaliation)

99.     The Plaintiff hereby repeats, realleges and incorporates paragraphs 1-98.

100.    By the acts and conduct described above, the Plaintiff engaged in protected activity under the ADEA, and Title VII and the Defendants were aware of such protected activity.

101.    By the conduct described above, the Defendants retaliated against the Plaintiff because of her protected conduct, including her opposition to discriminatory treatment and harassment and her complaints of harassment in violation of the ADEA and Title VII, 42 U.S.C. §2000e, et seq.

102.    The Defendants stated reasons for its actions are false and pretextual. The Defendants actions were retaliatory in that they were motivated by the Plaintiff's protected activity.

103.    The Defendants actions as described above were intentional and were engaged in with malice or with reckless indifference to the federally protected rights of the Plaintiff.

104.    As a result of the Defendants illegal conduct, the Plaintiff has suffered damages in the form of lost wages, benefits and other attendant rights, privileges and conditions of employment and has endured mental and emotional distress, pain and suffering, humiliation, mental anguish and other personal injuries.

**COUNT FOUR (CFEPA Retaliation)**

105.   The Plaintiff repeats, realleges and incorporates by referenced paragraphs 1-104 above.

106.   By the acts and conduct described above, the Plaintiff engaged in protected activity under CFEPA, and the Defendants were aware of such protected activity.

107.   By the conduct described above, the Defendants retaliated against the Plaintiff because of her protected conduct, including her opposition to discriminatory treatment and harassment and her complaints of harassment in violation of CFEPA, C.G.S. §46a-60(a)(4).

108.   The Defendants stated reasons for its actions are false and pretextual. The Defendants actions were retaliatory in that they were motivated by the Plaintiff's protected activity.

109.   By the acts and conduct described above, the Defendants have retaliated against the plaintiff in violation of CFEPA, C.G.S. §46a-60(a)(4).

110.   The Defendants actions as described above were intentional and were engaged in with malice or with reckless indifference to the federally protected rights of the Plaintiff.

111.   As a result of the Defendants illegal conduct, the Plaintiff has suffered damages in the form of lost wages, benefits and other attendant rights, privileges and conditions of employment and has endured mental and emotional distress, pain and suffering, humiliation, mental anguish and other personal injuries.

## DEMAND FOR RELIEF

**WHEREFORE**, the Plaintiff respectfully requests this Court grant her the following relief:

1.      Order the Defendants to cease and desist from the discriminatory acts against her;

2.      Order the Defendants to reinstate the Plaintiff to the position that she would have been in absent the Defendants discriminatory treatment;

3.      Order the Defendants to make the Plaintiff whole for all lost wages and benefits;

4.      Award the Plaintiff compensatory and punitive damages, including damages for pain and suffering;

5.      Award the Plaintiff liquidated damages.

6.      Award the Plaintiff reasonable attorneys fees interest and costs; and

7.      Award the Plaintiff all other legal or equitable relief that the Court deems appropriate.

THE PLAINTIFF,

By:  _____

Mary E. Kelly, ct07419
Livingston, Adler, Pulda, Meiklejohn
 & Kelly, P.C.
557 Prospect Avenue
Hartford, CT 06105-2922
Phone: (860) 233-9821
Fax: (860) 232-7818
E-mail: mekelly@lapm.org

## DEMAND FOR JURY TRIAL

The Plaintiff hereby demands a trial by jury as to all claims to which she is entitled as a matter of law.

THE PLAINTIFF,

By: _____

Mary E. Kelly (ct07419)
Livingston, Adler, Pulda,
  Meiklejohn & Kelly, P.C.
557 Prospect Avenue
Hartford, CT 06105-2922
(860) 233-9821
mekelly@lapm.org